Filed 8/3/15; on rehearing

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u><sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070238 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F05942) |
| v. | OPINION ON REHEARING |
| THEODORE SORIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Russell L. Hom, Judge. Affirmed as modified.

A.M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Michael P. Farrell, Assistant Attorneys General, A. Natasha Cortina, Catherine Chatman, Larenda R. Delaini, R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II through VI of the Discussion.

1

Defendant Theodore Soria appeals following jury verdicts finding him guilty of rape of an unconscious person (Pen. Code, § 261, subd. (a)(4)[1] (count one)) and rape of an intoxicated person (§ 261, subd. (a)(3) (count two)). Defendant admitted habitual criminal prior serious felony and strike conviction allegations (§§ 667, subd. (a), 667, subds. (b)-(i), 1170.12). Defendant was sentenced to a total aggregate term of 11 years. In sentencing defendant, the trial court imposed sentence on count two, but stayed execution of that sentence.

On appeal, defendant originally argued that conviction on one of the two counts must be stricken because both counts are based on a single act of intercourse with the victim. The People originally agreed that defendant could not be convicted of two counts, but argued the correct procedure is to consolidate the counts. We agreed. However, the People requested rehearing subsequent to the filing of our original opinion, contending that *People v. Gonzalez* (2014) 60 Cal.4th 533 (*Gonzalez*), compels a different result. The People now contend that defendant can be convicted of two counts and that the counts should not be consolidated or stricken. Defendant, on the other hand, agreed that the counts should be consolidated after we granted rehearing, but after the publication of *People v. White* (2015) 237 Cal.App.4th 1087 (*White*), once again contends one count should be stricken.

Defendant also argues the DNA evidence was unreliable and should not have been admitted, trial counsel provided ineffective assistance of counsel by failing to object to the DNA evidence, the trial court erred in giving a jury instruction on adoptive admissions, and the court abused its discretion in denying his motion to strike the prior strike conviction (§ 1385, subd. (a)). The People ask that we modify the judgment to include $70 in mandatory fees and assessments not imposed at sentencing.

---

[1] Undesignated statutory references are to the Penal Code.

In the published portion of this opinion, we conclude that the trial court erred by staying the sentence on one of the rape counts, and hold that defendant's convictions for rape of an intoxicated person and rape of an unconscious person must be consolidated into a single count reflecting rape under both subdivisions (a)(3) and (a)(4) of section 261.

In the unpublished portions of this opinion, we conclude that defendant forfeited his objection to the DNA evidence, and in any event that evidence was admissible and defense counsel did not provide ineffective assistance of counsel by not objecting to the DNA evidence. We further conclude that the trial court did not err in instructing on adoptive admissions and did not abuse its discretion when it refused to dismiss the strike allegation. We modify the judgment to order imposition of mandatory fees and assessments not imposed by the trial court.

We otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A second amended information filed in August 2011 charged defendant with a count of rape of an *unconscious person* (§ 261, subd. (a)(4) (count one)), and a count of rape of an *intoxicated person* (§ 261, subd. (a)(3) (count two)). The pleading also alleged a prior conviction as a strike offense (§§ 667, subds. (b)-(i), 1170.12) and a five-year habitual criminal sentencing enhancement (§ 667, subd. (a)).

A first trial resulted in a mistrial when the jury deadlocked on both counts.

### Prosecution's Case-in-Chief

On Saturday, November 28, 2009, around 8:00 or 9:00 p.m., the 44-year-old defendant was home, drinking beer, and playing video games, when his son Theo brought home three friends and a large bottle of vodka. The group of four -- all of whom were about 20 years old -- consisted of defendant's son, the son's new girlfriend, Karolyn Hawley, the son's friend, Heriberto Corral ("Beto"), and Beto's girlfriend, J.W., who is the victim. They planned to get drunk. They started drinking the vodka with juice or

3

soda in the son's bedroom. Defendant stayed in the living room, but someone brought him some vodka. The four young people mainly stayed in the son's bedroom but came out on occasion. For example, the victim came out for ice and Karolyn smoked marijuana with defendant in the living room. The victim did not smoke any marijuana.

The victim, who liked to get drunk and had previously blacked out from binge-drinking, drank four or five drinks, got drunk and dizzy, and vomited in the bathroom. Beto and Karolyn helped the victim to the bedroom of defendant's daughter, Sophia, who had come home earlier but left to sleep at a friend's house. The victim vomited in Sophia's bedroom, perhaps in a garbage can. Karolyn testified that she asked defendant for a "ratty shirt that he didn't really care about that she could sleep in." The reason she asked for the shirt was because she thought it would be uncomfortable for the victim to sleep in her clothes, but she told defendant she wanted the shirt for the victim because "she was sick." According to Karolyn, defendant went to his room, obtained a black shirt, and gave it to her. Karolyn brought the shirt to the victim in Sophia's room, said to change into it, and left the room. The victim fell asleep or passed out on top of the bedcovers, fully clothed. Karolyn and defendant's son fell asleep around midnight in the son's room. Beto stayed up playing a video game with defendant.

Around 2:30 or 3:00 a.m., the victim awoke. Her vagina was sore and wet. She was under the bedcovers, wearing only her underwear. Her clothes were on the floor by the bed, as were defendant's slippers.[2] The victim did not see any other article of clothing that belonged to defendant in the room. The victim found Beto asleep on the living room couch. She woke him and asked if they had "messed around." He said no. The victim became scared and said she thought defendant did something to her. The

---

[2] Defendant did not allow people to wear shoes in the house. He kept his slippers by the front door for anyone to wear, but the victim had never seen her friends wear the slippers, and Karolyn recalled seeing defendant wearing the slippers earlier in the evening.

4

victim and Beto woke up Karolyn and defendant's son, who said his father would not do anything sexual like that. The four talked and eventually fell asleep in the son's room. They awoke around 11:00 a.m. and went out to eat. The victim went home and showered.

Later, the victim returned to defendant's home to meet up with Beto. She saw defendant but did not interact with him. She saw Sophia, who was holding defendant's shirt in her hand and asked the victim what happened. Sophia noticed hickeys on the victim's neck. Beto said he was not responsible for the hickeys. Sophia revealed she had once been raped when drunk and that the victim should tell someone. At trial, the victim for the first time stated that Sophia said her father had "hit on" her friends in the past.

After Sophia and the victim spoke, Sophia asked defendant, in the victim's presence, why his shirt was in her bedroom. The victim testified defendant replied he brought the shirt to the victim because she was cold. The victim had no recollection of him bringing her a shirt.

Later that night, November 29, 2009, the victim told her mother what happened after Beto said he would tell unless the victim told. The three went to the hospital, where they spoke to a police officer who took them to UC Davis Medical Center, where the victim underwent a sexual assault examination.

The victim testified that after the night in question, she continued to visit defendant's home until she and Beto broke up in February 2010. Defendant did not act any differently toward her during these visits.

Karolyn, who did not believe defendant would ever take advantage of a drunk woman for nonconsensual sex, testified that the defendant did not treat the victim any differently when the victim visited the house after the night in question, and the victim did not seem uncomfortable around defendant during that time. Karolyn, who had been 19 years old at the time, testified that on that night at defendant's home, while she and defendant were smoking marijuana in the living room, she leaned over, exposing her

5

breasts, and defendant said, "nice rack," which she took as a compliment. Defendant had told both the victim and Karolyn that they were pretty. Karolyn testified she broke up with defendant's son in February 2010. She and defendant remained close platonic friends, going to the gym or lunch together or talking on the phone, but they did not talk about the case. Karolyn was not friends with the victim.

In April 2010, the victim, in the presence of a police detective, made a pretext phone call to defendant, which was tape-recorded and played for the jury. Defendant greeted her pleasantly, asked how she was, and said he had not seen her in awhile. She said she was "pretty good" and wanted to ask him "[a]bout that night I was over at your house, and it was Theo, me, Beto [] and Karolyn, and we were drinking with -- in Theo's room. I had somebody rape me, but I didn't really know who and I -- I mean, I -- your shirt and your slippers were in Sophia's room, so I thought -- and I'm pretty sure that you had sex with me and I want to know why." The following ensued:

"[Defendant]: Real -- really?

"[Victim]: Yeah.

"[Defendant]: Well, here let me sit down 'cause this is the first I've heard of this. Hold on. Let me go in the other room. Hold on.[3] Okay. I'm in shock right now. So, anyways, so what happened?

"[Victim]: Why -- I -- why did you have sex with me while I was passed out?

"[Defendant]: You know, I don't remember that -- that happening. I don't remember that at all. And I -- this is the first I've heard of this, and it's -- I don't know what to say. I'm shocked and sorry to hear that.

"[Victim]: But your shirt was on the floor, on the bedroom floor by Sophia's bed.

---

[3] We have listened to the audio of the call. There was a long pause of about 40 seconds at this point before defendant resumed the conversation.

6

"[Defendant]: Is that the shirt that Sophia gave me? Because I remember Karolyn giving me -- coming up to me and asking me for a shirt, and I gave her a -- a -- a black one. That's all I remember.

"[Victim]: Oh, well, that's the one that I -- that was on the floor as well as your slippers.

"[Defendant]: And I don't know about my slippers and stuff. I don't know what happened with that.

"[Victim]: I don't know. I woke up and they were by the bed.

"[Defendant]: I don't remember any of that. I -- I -- I -- all I remember is I was passed out in the living room, and Beto woke me up and he told me to get out of there, and so I went to my room and that's all I remember.

"[Victim]: Well, I know someone had taken my clothes off because when I woke up, I didn't have them on, and when I fell asleep, they were on.

"[Defendant]: Hum.

"[Victim]: So I don't --

"[Defendant]: I don't know what to say other than I'm sorry. I don't remember any of that.

"[Victim]: I don't really remember. That's why I was calling to ask.

"[Defendant]: I don't remember either. I just feel bad now. I mean, I've always respected you and I -- I always thought you were attractive, but I don't remember ever carrying out anything like that.

"[Victim]: Well, I know I had sex, and I know it was you. It had to be.

"[Defendant]: I don't remember. I -- I would have to trust your word on that and say sorry 'cause I don't remember anything like that. I'm sorry, [J.]. And I -- I really don't remember anything like that. I just -- I just apologize. If I did that, then I'm sorry."

The conversation continued in the same vein. The victim asked if defendant had used protection, and he said he did not remember any of that night, other than waking up

around 5:00 or 6:00 a.m., when "you guys" left and later came back. The victim said Beto said it happened. Defendant expressed surprise and said Beto never mentioned a word to him.

The victim said she thought defendant way lying. Defendant said he was sorry she felt that way. He woke up with all his clothes on in his own bed and "I don't know. Honestly I don't know. I just -- I -- I -- if this all happened like you said, then I -- I totally regret my actions, and I apologize whole-heartedly. I don't remember any of that." The conversation continued:

"[Victim]: Do you think I'm attractive?

"[Defendant]: I always have, yeah. I just wish I was more in shape and had money and stuff. I think probably I would think (unintelligible) might be a little bit different if I was to ever ask you out. But you were with Beto, so I never even thought of it. [¶] But, yeah, I've always thought you were attractive. Still do. I just -- I don't remember any -- doing anything stupid like that."

"[Victim]: Well, why would you do that if I was passed out?

"[Defendant]: "I don't know. I can't explain my actions if that happened that night like that. I don't remember. I don't remember at all. I'm sorry. I just remember being hella drunk 'cause I remember I was taking hits off that bottle besides drinking that beer. [¶] In fact, the last thing I remember is Beto waking me up when I was passed out on the living room floor still playing the video game. [¶] . . . [¶] I remember all of us drinking and stuff. And I remember Karolyn. I do remember Karolyn trying to make you smoke out of the bong. I remember that. And I remember saying, don't -- you know, don't do it if you don't want to. [¶] Let's see what else I remember that night. I remember playing video games. I remember all you guys went inside Theodore's room, and that's about all I remember."

The victim asked if defendant was sorry. He said, "of course I am. I don't want it like that. I've always liked you and stuff, and, you know, I don't want it to be like that. I

wish I would have talked to you about this sooner. I didn't know. I swear." The victim asked about protection. He said he did not remember, but "if you're worried about anything," he was tested in January when he got into "that other relationship" and was "totally clean."

After more of the same equivocal apologies "if it happened," defendant asked why the victim was calling now. She said she had a nightmare about it. She asked:

"[Victim]: Why did you do this?

"[Defendant]: I honestly don't know. I don't know. I -- the only thing, like I said, is I've always thought you were pretty and attractive, and I've always liked you as a person. I've always respected you. I think you got your head on your shoulders, and I think Beto's stupid. You know? That's what I thought -- always thought about you. I never thought about anything else like that."

The victim said, "I need you to say you're sorry." Defendant said, "I am. I'm sorry. I'm sorry. I just don't remember any of that. . . ." The victim said she thought he was lying. Defendant said he was sorry she felt that way. The victim finally ended the call.

The victim testified she did not really remember defendant being on top of her, as she stated during the pretext call at the detective's prompting. She was not attracted to defendant and felt "grossed out" when he said he was attracted to her.

A nurse testified she performed the sexual assault examination on the victim. The victim said she had not had intercourse within the previous five days. The nurse did not notice any bleeding, trauma, or other physical injury, but sexual assault victims commonly present without injury or trauma. Even unconscious, the body can lubricate and have a sexual response. The examination revealed nothing inconsistent with consensual sexual intercourse. The nurse did not observe any sperm on genital swabs under the microscope but forwarded them for DNA testing. However, the nurse did observe an approximately two-centimeter hickey on the victim's neck.

9

A criminalist testified she detected sperm in the vaginal, cervical, and anal swabs taken from the victim. The vaginal and cervical swabs had high concentrations of sperm, while the anal swab had a low concentration, which led the criminalist to opine that the sperm from the anal swab was probably drainage from the vagina rather than evidence of sodomy.

Ryan Nickel, a criminalist with the Sacramento County District Attorney's office, testified as a DNA expert. He analyzed a vaginal swab,[4] first separating a sperm fraction from the victim's epithelial cells, which are the cells lining body cavities. Taking a small portion of the sperm fraction for DNA testing, Nickel obtained a DNA profile from it and compared it to buccal reference samples obtained from defendant, defendant's son, and Beto. Nickel was able to exclude defendant's son and Beto as the major profile contributor of the sperm fraction.

Nickel compared the sperm fraction with defendant's buccal swab sample at the standard 15 locations and testified they matched at 14 locations. At one location, locus D-5, there were three alleles instead of the standard two. Two of these alleles were the same as defendant's profile at the D-5 locus, as were the alleles at the other 14 locations. One allele at D-5 was not consistent with defendant's profile. Thus, Nickel concluded, "[t]he major profile from the sperm fraction is the same as [defendant's] reference profile. And the reason I said the major profile is because we have a location . . . at D-5 where a minor allele was detected. And I called this in my report as carryover from the [epithelial] cell fraction. . . . [The victim's] profile is a 12, 12. And that is consistent with that minor allele being carried over to that sperm fraction." Nickel explained that the differential extraction process "isn't a 100 percent efficient process." Carryover occurs when the sperm cells are not separated from all of the epithelial cells in the

---

[4] Other vaginal swabs remained available for defense testing.

10

extraction process and, for example, some of the epithelial cells are in the sperm fragment. This kind of carryover is "pretty common" and Nickel had seen it on "multiple occasions." The third allele was a 12, and the victim was a 12 at that location. Nickel opined that "the most likely explanation, which we see at the laboratory when we do differential extractions all of the time, is carryover."

Nickel testified that there are two other possible explanations for the third allele at D-5. One is that the profile includes a tri-allele. A tri-allele is a very rare phenomenon, but Nickel has occasionally observed them. If the "12" allele at locus D-5 is part of a rare tri-allele, then the DNA profile for the sperm fraction does not match defendant's DNA from the buccal swab, because defendant's DNA from that swab has no tri-alleles at any locus. Nickel said the third allele could be explained by a mutation, though he found no mutation when working on the case, and his notes made no mention of a mutation. Nickel indicated there was no way of knowing if it were a tri-allele belonging to defendant without obtaining a semen sample from defendant for comparison.[5] Nickel testified defendant's semen sample could be different from his buccal sample by a tri-allele. Semen samples are not ordinarily collected by law enforcement, but the defense could have obtained a sample of defendant's semen and tested it. Nickel said that characterizing the results as a tri-allele would not exclude defendant, despite the absence of a tri-allele in defendant's DNA profile at locus D-5.

Another explanation for the third allele reading of "12" at locus D-5 could be that it came from an unknown male contributor or Beto. Beto has a "12" allele at D-5, so it was possible that it was a carryover from Beto. However, had the third allele been Beto's, Nickel would have expected to see other alleles matching Beto's profile. Nevertheless, he could not include or exclude Beto as being the contributor of that allele.

---

[5] Defendant questions this, because Nickel had said that DNA from blood and saliva would be the same.

On cross-examination, Nickel agreed there was "no scientific basis" for his opinion that the third allele was carryover from the non-sperm fraction. "I didn't determine that it was -- but I've seen it in multiple occasions that this crossover does occur, so I decided to call it as a 12 from carryover." Nickel was not aware of any cases documenting a 14-loci match in samples from different people.

Nickel acknowledged that laboratory protocol requires repeating the differential extraction process if epithelial cells are detected in a sperm fraction, but he did not do so because he saw no epithelial cells in the small representative sample from the extraction he examined under the microscope. When asked to explain how he could characterize the third allele at locus D-5 as carryover from the epithelial portion of the sample if the differential extraction process was properly performed, Nickel said, "I'm saying there's no way to determine that minor allele at the D-5 location, there's no scientific basis to determine if it's carryover, triallele or another individual." Nickel's opinion that the third allele was carryover, was based on his professional wisdom gathered from his work, training, experience, and talking to colleagues.

Nickel provided several reasons why he decided to characterize the third allele as carryover from the nonsperm fraction. He said he had seen "in multiple occasions that this crossover does occur." He would expect to see additional alleles at other locations if there was more than one sperm contributor to the vaginal sample. The absence of additional alleles at other locations led him to form the opinion that the additional allele was a carryover from the victim's DNA profile. Thus, despite the other possibilities, based on his training and experience, Nickel opined that defendant was the major DNA contributor of the sperm fraction from the victim's vaginal swab.

Using the FBI statistical program, Nickel testified the statistical frequency of occurrence of the same DNA profile as defendant, who does not have an identical twin,

12

would be one in two sextillion African-Americans, one in nine quintillion Caucasians, and one in one quintillion Hispanics.**6**

### Defense Case

Michelle Okazaki testified she and defendant had been dating since 2007, exclusively, "[f]or the most part," seeing each other "at least once a month" until 2010. She did not hear from him for a long time and assumed he lost interest. She later learned he had been arrested. Eventually, in 2011, he told her about the victim's accusation. Although Okazaki did not know about the accusation until 2011, she testified she saw the victim and Beto at defendant's home a couple of weeks after the night in question, and the victim was comfortable around defendant and even wanted to spend the night at his house rather than ride her bicycle or accept Okazaki's offer to drive her home. Okazaki did not believe defendant would ever take advantage of an intoxicated woman and commit a nonconsensual sex act.

Melissa Tiner testified she and defendant knew each other for 14 or 15 years, were best friends, and dated on and off for several months. On the day after the night in question, she picked up defendant for lunch. She had never seen him more hung over. She did not think he would take advantage of a young intoxicated woman and commit a nonconsensual sex act.

Two of Sophia's friends testified they had been around defendant when he was drunk and when he was sober and did not believe he would ever take advantage of a young intoxicated woman and commit a nonconsensual sex act.

Beto testified that he and the victim both got drunk that night. He had never seen her that drunk. However, he saw her drunk on many occasions, sometimes so drunk that she later had no memory of what she did. Beto checked on the victim after she went to

---

**6** As our high court has noted, the world's population is only 7 billion. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1247.)

Sophia's room but did not recall whether her clothes were on, but he recalled that she was under the covers. Around midnight, Beto went out to get some food. When he returned, no one was awake. He woke up defendant, who was "passed out" asleep on the living room floor, and told him to go to bed. Defendant replied he was not sleeping and resumed playing video games. Beto watched defendant playing the video games until Beto fell asleep on the couch. At some point, Beto heard defendant walk toward his bedroom, which is on the opposite side of the house from Sophia's room. At some point thereafter, the victim awakened Beto and asked if they had had sex. He said no. She kept asking if he was certain. Eventually, she asked if he thought defendant might have done something to her. When Beto asked why, she said she woke up naked and defendant's slippers were by the bed.

After that night, Beto and the victim continued to hang out at defendant's house, though the victim said she did not want to go there anymore. On one occasion, they rode bikes to defendant's house, and defendant gave them a ride home. Beto did not recall the victim wanting to stay the night or Okazaki offering a ride home.

Sophia testified defendant was wearing socks on the night in question and did not usually wear slippers with socks. She said she remembered he was wearing socks because "he had a hole in them." However, she also admitted she previously testified she had no reason to pay attention to what defendant had on his feet. When Sophia returned the next day, her bed was unmade and defendant's shirt was on her floor. She asked her brother and Beto why, and they told her what the victim said about waking up with a sore vagina. When the victim returned, the victim confided the same thing to Sophia, who related that she had been raped in high school, and encouraged the victim to speak with someone. Sophia asked defendant why his shirt was in her room. He said Karolyn wanted the shirt because someone was vomiting. Sophia testified defendant did not remember who was vomiting. "He was kind of all over the place. Somebody needed a shirt kind of thing." Sophia was concerned that defendant's shirt and slippers had been in

14

her room. She checked the bedding for secretions but did not see anything. She set aside the bedding in case the victim later remembered anything, but when the victim came over the next day, Sophia washed the bedding because she did not think the victim would come back if defendant had raped her. Sophia never asked defendant about what the victim had said. Sophia testified her father was respectful of her privacy. None of her friends ever complained about defendant hitting on them, and she did not believe he would ever take advantage of a young intoxicated woman and commit a nonconsensual sex act.

Defendant's son did not testify.

Dr. Gregory Sokolov, a psychiatrist, testified as an expert witness on Ambien. He said Ambien is a sedative prescribed for insomnia. Most patients take it right before they go to bed. Patients with anticipatory anxiety about another sleepless night may take it earlier. It is not prescribed for depression, but some patients take both Ambien and an anti-depressant. Ambien is not recommended for anxiety, but some doctors prescribe "off label." Ambien has a very rare side-effect in that it can cause a sedated hypnotic intoxicated state, during which the patient engages in complex behavior while unconscious of the act, with little or no memory of it later. The behavior includes sleepwalking, sleep-eating, sleep-sex, and sleep-driving. Mixing alcohol with Ambien increases the risk of this complex behavior. Around 2006 or 2007, the federal government required the drug maker to warn doctors of this side-effect. Responding to a hypothetical question involving nonconsensual sex imposed upon another person by a person who took Ambien, drank 60 ounces of beer and four to five vodka cocktails, smoked marijuana, and had no recollection of having sex, Dr. Sokolov opined that the conduct "could be consistent with a sedative hypnotic intoxication and/or complex behavior event," and from a psychiatric medical perspective, such conduct would be involuntary.

Defendant testified. He planned to spend the evening alone on his living room couch playing with his Xbox. He took an Ambien around 4:00 or 5:00 p.m., before he went to the store and bought a video game, a headset, and beer. Defendant testified he got a prescription in 2006 to take Ambien as needed to help with anxiety, stress, depression, and insomnia. He had taken Ambien for a couple of nights before this incident due to stress from being laid off from his job. Ambien sometimes puts him to sleep, but he did not care if he fell asleep because he bought the game rather than renting it and could play it whenever he wanted. Defendant did not learn of the potential rare side effect of Ambien until a prior hearing when the doctor testified.

As defendant was getting his game set up, he received a phone call from the victim and Beto, wanting to come over. He reluctantly agreed. His son came home with Karolyn, and the victim and Beto arrived with a large bottle of vodka and some mixers. The four young people mainly stayed in his son's bedroom and went back and forth to the kitchen. Karolyn wanted to smoke marijuana, so she and defendant smoked marijuana in the living room. The two young men moved back and forth between the son's room and the living room to check out the video game defendant was playing. The victim offered defendant vodka and orange juice, and he accepted. He accepted offers of refills and drank "around five-ish" vodka drinks that night.

The victim got drunk and loud. Defendant heard someone urging the victim to lie down. He heard sounds like someone was vomiting. He did not try to help, because it had happened before, and the girls usually take care of it. Defendant testified that he had a vague recollection of Karolyn asking him for a shirt, and he gave her one. He had previously testified that he had just washed clothes and obtained the shirt from the laundry.

The last thing defendant remembered from that night is Beto helping him up off the floor and into defendant's bedroom, though Beto contradicts it. The next thing defendant remembered is getting a phone call the next morning around 11:00 a.m. from

16

his friend Melissa about a planned lunch with her he had forgotten. He awoke with the worst hangover of his life. He did not have the burning sensation that he gets after sex and there was no other indication he had had sex the previous night. He was fully dressed as he had been dressed the night before. Defendant was wearing a T-shirt, hooded sweatshirt, sweat pants, and socks. That he awoke clothed was significant to him because he takes off his clothes when he has sex and he did not remember taking off his clothes that night. He keeps slippers out for going outside or for women who complain about his rule against wearing shoes in the house. He does not normally wear his slippers around the house but does so on occasion. He testified he does not know how his slippers got into Sophia's room. Nor does he know how his sperm got into the victim's vagina.

When defendant returned home from having lunch with Melissa, the victim and the others were playing a video game. The victim acted completely normal, continued to hang out at defendant's home, continued to interact with him as usual, and never said anything about defendant having sex with her. On one of those visits, the victim told Michelle that she, the victim, did not want to go home. About four or five weeks after the night in question, the victim stopped coming to defendant's home.

About three or four months after the night in question, defendant received the phone call from the victim accusing him of rape. He was shocked. He did not deny it, because she was a friend, he did not remember anything from that night, and he "had no reason to disbelieve her." He apologized to be polite and let her know he was sensitive. His daughter went through something like that and he wanted to make sure the victim knew he was concerned about her well-being. He told her he was attracted to her to be kind. He testified, "I was in fear of what was going on as far as her saying that I raped her and so I thought it was the best thing to ease the situation. So being as polite as possible I said that as far as to pretty much defuse the situation because I was clueless on what was going on at that point in time because no one said anything."

17

Defendant was angry with Beto for not alerting defendant to the victim's allegation, but defendant and Beto later reconciled.

Defendant testified his ex-wife complained he had difficulty performing sex acts when drunk.

Defendant admitted complimenting Karolyn's breasts. When she asked for marijuana, she leaned over, and one breast fell out in front of his face. He was uncomfortable and did not know what to say, so he paid her the compliment, and she laughed, put her breast back in her blouse, and they never spoke of it again. When asked if he would joke with women about sex, he said, "I've been inappropriate, but I wouldn't cross the line and touch nobody."

Defendant testified he does not believe he had sex with the victim. When asked on direct examination, "You heard the DNA evidence in the case?" defendant answered, "Yeah, I have to accept that." He testified, "I have no memory of anything that night. Nothing. Anything of having sex. Nothing. I don't remember nothing like that." When asked if he believed himself capable of taking advantage of a young intoxicated woman without her consent, he said, "No, absolutely not. And all my daughters' friends have partied with me, they've slept on the couch along side with me and there's been no incidents ever since I was even in college ever, anything accusation [*sic*] like this. No."

Before this incident, the victim stayed overnight on her first visit to defendant's home; she and two of her girlfriends slept on defendant's bed, and he slept on the couch.

### Prosecution Rebuttal Case

Sacramento Police Department Officer James Sobodash spoke with Beto at the hospital when the victim was there for the sexual assault examination. Beto told Sobodash that he went to Taco Bell around 11:30 p.m. The victim had been put in Sophia's room earlier. When Beto returned around midnight, he checked on the victim. She was covered by a blanket and was wearing her yellow and gray long-sleeved shirt. Beto woke up defendant and watched him play a video game until Beto fell asleep. Beto

18

was awakened by the victim around 2:30 a.m., and she told him about her suspicions. She mentioned that defendant's slippers were by the bed. Beto asked to see them and the victim went into Sophia's room and came out with the slippers. Beto said he started to freak out at that point.

Later in the day, when Sophia was talking to the victim, Sophia asked defendant why his shirt was in her bedroom. According to Beto, defendant said the victim had asked for the shirt because she was sick. The victim whispered to Beto that she had never asked defendant for a shirt.

Beto told Sobodash that the first time defendant met Karolyn he told her, "Wow, you have a perfect pair of tits, you know that?"

## Verdicts and Sentencing

On December 20, 2011, the jury found defendant guilty on both rape counts. Defendant admitted he had previously been convicted of assault with a deadly weapon in 1991, and later moved to dismiss the prior strike. The trial court denied the motion. On January 20, 2012, the court sentenced defendant to an aggregate term of 11 years calculated as follows: the low term of three years on count one, doubled for the prior strike conviction (§ 667, subd. (e)(1)), plus a consecutive term of five years for the habitual criminal serious felony enhancement. The court imposed the same sentence for count two but stayed execution pursuant to section 654.[7]

---

[7] Section 654 provides in pertinent part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

19

# DISCUSSION

## I. Two Counts of Rape for a Single Act of Intercourse

### A. Additional Procedural Background

Defendant originally argued he was erroneously convicted of two counts of rape based upon one act of intercourse with one victim. He asked that we strike the conviction on one of the rape counts.[8] The People agreed that defendant could not be convicted of two counts, but argued the appropriate procedure is consolidation rather than striking one of the convictions as urged by defendant. We agreed with the People and issued an opinion in which we ordered the trial court to consolidate the counts.

After this court filed its original opinion, the People requested rehearing, indicating that it had changed its position in light of the recently filed California Supreme Court opinion in *Gonzalez*, *supra*, 60 Cal.4th 533. We had addressed *Gonzalez* in our original opinion, but granted the People's request for rehearing and ordered supplemental briefing. Subsequently, Division 1 of the Fourth District published *White* in which the court held a defendant could not be convicted both rape of an intoxicated person and rape of an unconscious person for a single act of intercourse. (*White*, *supra*, 227 Cal.App.4th at pp. 1090, 1097.) Instead of consolidating the counts, however, the *White* court struck the second count of rape. (*Id*. at pp. 1090, 1104.) At the rehearing oral argument, defendant asked us to follow *White* and strike one of the counts.

Adhering to the California Supreme Court's decision in *People v. Craig* (1941) 17 Cal.2d 453 (*Craig*), we again conclude that defendant cannot be convicted of two counts of rape for a single act of intercourse and that the two counts must be consolidated.

---

[8] Defendant did not raise this issue in the trial court when the trial court imposed and stayed a sentence on one of the rape counts, but a sentence unauthorized as a matter of law is reviewable on appeal despite the defendant's failure to object in the trial court. (*People v. Scott* (1994) 9 Cal.4th 331, 354.)

## B. Analysis

Section 261 defines rape as sexual intercourse committed under seven different circumstances, all of which describe lack of consent.[9] Defendant was charged with section 261, subdivision (a)(3), intercourse with an intoxicated person, and section 261, subdivision (a)(4), intercourse with an unconscious person. Both counts related to the single act of intercourse.

In *Craig*, *supra*, 17 Cal.2d 453, the California Supreme Court held that under section 261, only "one punishable offense of rape results from a single act of intercourse, although that act may be accomplished under more than one of the conditions or

---

[9] Former section 261 in effect at the time of the charged offenses provided in pertinent part: "(a) Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: [¶] (1) Where a person is incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act. . . . [¶] (2) Where it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another. [¶] (3) *Where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused.* [¶] (4) *Where a person is at the time unconscious of the nature of the act, and this is known to the accused.* . . . [¶] (5) Where a person submits under the belief that the person committing the act is the victim's spouse, and this belief is induced by any artifice, pretense, or concealment practiced by the accused, with intent to induce the belief. [¶] (6) Where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat. . . . [¶] (7) Where the act is accomplished against the victim's will by threatening to use the authority of a public official to incarcerate, arrest, or deport the victim or another, and the victim has a reasonable belief that the perpetrator is a public official. . . ." (Italics added.) The current section 261 is not structurally different from the former section. Other than the addition of the word "any" to subdivision (a)(4), textually, the only change from the former statute under which defendant was convicted to the current statute was to subdivision (a)(5) of section 261, rape by artifice, pretense, or concealment. This type of rape was expanded from the victim submitting under the belief that the person committing the act was the victim's spouse to the belief that the person was "someone known to the victim other than the accused." (Italics added)

21

circumstances specified in the . . . subdivisions. These subdivisions merely define the circumstances under which an act of intercourse may be deemed an act of rape; they are not to be construed as creating several offenses of rape based upon that single act." (*Id.* at p. 455.)

The defendant in *Craig* was convicted of two counts of rape based on a single act of intercourse committed without consent and against the will of the 16-year-old victim. (*Craig*, *supra*, 17 Cal.2d at p. 454.) The first count alleged rape by force and the second count alleged the victim was under the age of consent. (*Ibid.*) The *Craig* court held, "There has been a violation of but one statute -- section 261 of the Penal Code.[10] And, while the proof necessarily varies with respect to the several subdivisions of that section under which the charge may be brought, the sole punishable offense under any and all of them is the unlawful intercourse with the victim. . . . [O]nly one punishable offense of rape results from a single act of intercourse, though it may be chargeable in separate counts when accomplished under the varying circumstances specified in the subdivisions of section 261 of the Penal Code." (*Id.* at p. 458.)

---

[10] As we discuss *post*, statutory rape, now commonly known as "unlawful sexual intercourse with a minor," is now separately defined under section 261.5. "At the time *Craig* was decided, former section 261 read in full as follows: 'Rape is an act of sexual intercourse, accomplished with a female not the wife of the perpetrator, under either of the following circumstances: [¶] 1. Where the female is under the age of eighteen years; [¶] 2. Where she is incapable, through lunacy or other unsoundness of mind, whether temporary or permanent, of giving legal consent; [¶] 3. Where she resists, but her resistance is overcome by force or violence; [¶] 4. Where she is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution, or by any intoxicating narcotic, or anesthetic, substance, administered by or with the privity of the accused; [¶] 5. Where she is at the time unconscious of the nature of the act, and this is known to the accused; [¶] 6. Where she submits under the belief that the person committing the act is her husband, and this belief is induced by any artifice, pretense, or concealment [practiced] by the accused, with intent to induce such belief.' (As amended by Stats. 1913, ch. 122, § 1, p. 212.)" (*Gonzalez*, *supra*, 60 Cal.4th at p. 539, fn. 2.)

This view of section 261 was reaffirmed in *Gonzalez*, *supra*, 60 Cal.4th 533.  In *Gonzalez*, our high court held a defendant could be convicted of both oral copulation of an unconscious person and oral copulation of an intoxicated person (§ 288a, subds. (f), (i)[11]) based on a single act, although he could not be punished for both.  (*Gonzalez*, at

---

[11] Former section 288a in effect and applicable in *Gonzalez* provided in pertinent part: "(a) Oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person.  [¶]  (b)(1) Except as provided in Section 288, any person who participates in an act of oral copulation with another person who is under 18 years of age shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year.  [¶]  (2) Except as provided in Section 288, any person over 21 years of age who participates in an act of oral copulation with another person who is under 16 years of age is guilty of a felony.  [¶]  (c)(1) Any person who participates in an act of oral copulation with another person who is under 14 years of age and more than 10 years younger than he or she shall be punished by imprisonment in the state prison for three, six, or eight years.  [¶]  (2) Any person who commits an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years.  [¶]  (3) Any person who commits an act of oral copulation where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat, shall be punished by imprisonment in the state prison for three, six, or eight years.  [¶]  (d) Any person who, while voluntarily acting in concert with another person, either personally or by aiding and abetting that other person, commits an act of oral copulation (1) when the act is accomplished against the victim's will by means of force or fear of immediate and unlawful bodily injury on the victim or another person, or (2) where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat, or (3) where the victim is at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act, shall be punished by imprisonment in the state prison for five, seven, or nine years.  . . .  [¶]  (e) Any person who participates in an act of oral copulation while confined in any state prison, as defined in Section 4504 or in any local detention facility as defined in Section 6031.4, shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year.  [¶]  (f) Any person who commits an act of oral copulation, and the victim is at the time unconscious of the nature of the act and this is known to the person committing the act, shall be punished by imprisonment in

23

p. 535.)  However, in so doing, the court reaffirmed *Craig* and distinguished section 288a from section 261.  (*Id.* at pp. 538-540.)  The court noted that in *Craig* it had "concluded, based on the wording and structure of the statute, that former section 261 set forth only one offense that could be committed under several different circumstances, as described in its several subdivisions."  (*Id.* at p. 539.)  "Section 288a is textually and structurally different from former section 261.  Subdivision (a) of section 288a defines what conduct constitutes the act of oral copulation.  Thereafter, subdivisions (b) through (k) define various ways the act may be criminal.  Each subdivision sets forth all the elements of a crime, and each prescribes a specific punishment.  Not all of these punishments are the

the state prison for a period of three, six, or eight years. . . .  [¶] . . . [¶]  (g) Except as provided in subdivision (h), any person who commits an act of oral copulation, and the victim is at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act, shall be punished by imprisonment in the state prison, for three, six, or eight years. . . .  [¶]  (h) Any person who commits an act of oral copulation, and the victim is at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act, and both the defendant and the victim are at the time confined in a state hospital for the care and treatment of the mentally disordered or in any other public or private facility for the care and treatment of the mentally disordered approved by a county mental health director, shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year. . . .  [¶]  (i) Any person who commits an act of oral copulation, where the victim is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused, shall be punished by imprisonment in the state prison for a period of three, six, or eight years.  [¶]  (j) Any person who commits an act of oral copulation, where the victim submits under the belief that the person committing the act is the victim's spouse, and this belief is induced by any artifice, pretense, or concealment practiced by the accused, with intent to induce the belief, shall be punished by imprisonment in the state prison for a period of three, six, or eight years.  [¶]  (k) Any person who commits an act of oral copulation, where the act is accomplished against the victim's will by threatening to use the authority of a public official to incarcerate, arrest, or deport the victim or another, and the victim has a reasonable belief that the perpetrator is a public official, shall be punished by imprisonment in the state prison for a period of three, six, or eight years."

24

same.  That each subdivision of section 288a was drafted to be *self-contained* supports the view that each describes an independent offense . . . ."  (*Ibid.*, italics added.)

While textually different from the former section 261 analyzed in *Craig*, the former section 261 in effect and applicable to defendant and the current version are not structurally different from their predecessor,[12] and the current rape statute remains textually and structurally different from section 288a.[13]  Like the former section 261, the current statute sets forth only one offense that can be committed under several different circumstances, as described in its several subdivisions.  The current punishment for rape is set forth in a separate section, which specifies that all forms of rape have the same punishment except for rape by means of force, violence, duress or fear of injury perpetrated upon a minor under 14 or a minor over 14.  (§ 264, subds. (a), (c)(1), (c)(2).)

Our high court in *Craig* established the appropriate procedure to be employed when a defendant is convicted of two counts of rape under separate subdivisions in section 261 for the same act of intercourse.  "The 'judgments' entered by the trial court should be modified to the extent of consolidating them into a single judgment."  (*Craig*, *supra*, 17 Cal.2d at p. 458.)  Thus, the *Craig* court modified the judgment to state that the defendant had been found guilty of rape "as defined and proscribed in subdivisions 1 and 3 of [former section 261], and as charged in counts 1 and 2 . . . , being separate statements of the same offense . . . ."  (*Id*. at p. 459.)[14]

---

[12]  See footnotes 9 and 10, *ante*.

[13]  See footnote 11, *ante*, for the former section 288a analyzed in *Gonzalez*, *supra*, 60 Cal.4th 533.  There have since been two amendments to section 288a, the most recent effective September 2013.  While there have been textual changes not relevant here, the current section 288a is not structurally different from its predecessors.

[14]  The same offense can be alleged in different counts, but as a " 'different statement of the same offense.' "  (§ 954; see also *Craig*, *supra*, 17 Cal.2d at p. 456.)  Here, the

25

Defendant here originally argued that we should pick out one count and strike it. We found his cited authorities to be inapposite. Neither case involves section 261 nor mentions *Craig*.

In *People v. Shabtay* (2006) 138 Cal.App.4th 1184, a case originally relied upon by defendant, the defendant was convicted of two counts of grand theft by possession of access card numbers of 11 victims. The *Shabtay* court held that the plain language of section 484e, subdivision (b) -- defining an offense of grand theft where a person "within any consecutive 12-month period, acquires access cards issued in the names of four or more persons which he or she has reason to know were taken or retained" with intent to defraud -- precluded multiple convictions where the prosecution alleged the defendant acquired all the access cards within a consecutive 12-month period. (*Id*. at pp. 1189, 1191.) The *Shabtay* court reversed the conviction on one of the two counts. (*Id*. at p. 1192.)

Defendant's other cited authority, *People v. Packard* (1982) 131 Cal.App.3d 622, is also off point. There, the prosecution alleged three counts of grand theft for taking money and personal property exceeding $200 in value from his employer. Each count alleged theft in a separate year -- 1976, 1977, and 1978. The People did not contend the defendant had three separate yearly schemes but instead argued three counts were proper because section 487, subdivision 1, stated that where the value of money or property taken by an employee from his employer totaled $200 or more in any 12-consecutive-month period, " 'then the same shall constitute grand theft.' " (*Id*. at p. 626.) The appellate court reversed two of the counts, stating the only reasonable conclusion supported by the record was that the defendant had a single continuing plan or scheme for

---

information erroneously alleged that count two was "*a different offense* of the same class of crimes and offenses as the charges set forth in Count One . . . ." (Italics added.)

stealing from his employer and should have been convicted of only a single grand theft. (*Id*. at pp. 626-627.)

These court of appeal theft cases have no bearing on the appropriate procedure here, where the issue relates to a single act of intercourse committed under two statutory circumstances set forth in section 261, particularly where our high court has expressly spoken about the matter. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).)

The People commendably acknowledged a case not cited by defendant in the original briefing, in which this court ordered a second count stricken where the defendant was convicted of rape of an intoxicated woman and rape of an unconscious woman based on a single act of intercourse. (*People v. Smith* (2010) 191 Cal.App.4th 199, 205 (*Smith*).) However, the argument that the proper procedure is to consolidate was not addressed in *Smith*. Cases are not authority for propositions not therein considered. (*People v. Scheid* (1997) 16 Cal.4th 1, 17.)

Recently, in *White*, as we have noted, Division One of the Fourth Appellate District agreed that a defendant could not be convicted of two counts of rape charged under different subdivisions of section 261 for a single act of intercourse. Citing *Smith* without analysis and without reference to the consolidation procedure mandated in *Craig*, the *White* court struck the second count of rape. (*White*, *supra*, 237 Cal.App.4th at p. 1103.) Instead, we adhere to the procedure mandated by our high court -- consolidation.

Although rape is a unitary offense, violations of different subdivisions may have distinct penal consequences; therefore, it would be inappropriate to strike counts. For example, section 667.61, subdivision (c), calls for sentence enhancement for rape in violation of section 261, subdivision (a)(2) [force], or (a)(6) [threat of force]. Section 290.008 requires registration as a sex offender of a person discharged or paroled following confinement as a juvenile delinquent for rape under section 261,

27

subdivision (a), paragraphs (1) [mental or physical disability rendering victim incapable of consent], (2) [force],  (3) [intoxicated victim], or (4) [unconscious victim].  Section 290.46 affords the public Internet website access to a list of sex offenders including rapists under section 261, subdivision (a)(2) [force] or (a)(6) [threat].  Section 1203.065, subdivision (a), prohibits probation for rapists who use force or threat of force, and subdivision (b), limits probation where rape is committed by a threat to arrest, incarcerate or deport the victim.  Vehicle Code section 13377, subdivision (a)(2), prohibits issuance of a tow truck driver certificate to a person convicted of rape under section 261, subdivision (a), paragraphs (1) [disabled victim], (2) [force], (3) [intoxicated victim], or (4) [unconscious victim].[15]  In the future, there may be additional penal consequences for convictions of various subdivisions of the rape statute as a result of additional legislation or new enactments by the voters.  For purposes of the application of such consequences, the record should reflect when a defendant has been convicted of multiple types of rape under section 261 for a single act of intercourse.  The record will so reflect when those counts have been consolidated, but it will not when a count has been stricken.

Additionally, as pointed out by the dissent in *White*, an unintended consequence results if a rape count is stricken in the trial court, and on appellate or habeas review, the remaining rape count is later reversed for reasons specific to that subdivision of section 261 -- the defendant would stand convicted of nothing.  (*White*, *supra*, 237 Cal.App.4th at p. 1112 (conc. & dis. opn. of *Benke*, J.).)  When a jury has found a defendant guilty of rape under more than one circumstance, such a result should be avoided and can be avoided by consolidating the various counts of rape for which a defendant has been

---

[15]  Although section 667.6, subdivision (e), requires multiple acts of intercourse, we note that it also treats different subdivisions of section 261 differently.  For example, it subjects a defendant to consecutive sentencing, an enhancement, and a fine if convicted of rape of an intoxicated victim (§ 261, subd. (a)(3)) but not when convicted of rape of an unconscious victim (§ 261, subd. (a)(4)).

convicted. If consolidated and one of the statutory basis for the conviction is later reversed for reasons independent of the other, the other statutory basis would remain and the defendant would still stand convicted of rape.

Finally, we ask how is a court to decide which of the multiple counts of rape to strike? Does a court simply strike all but the first count? Does the court hear argument on which count to strike and if so, what criteria should be used to decide? No guidance can be found in the law to answer these questions, and none is required where the court simply consolidates the counts.

Accordingly, we apply the procedure our high court employed more than 70 years ago in *Craig* and modify the judgment by consolidating the two counts into a conviction for a single count of rape reflecting violations of section 261, subdivisions (a)(3) and (a)(4).

The People contend that our high court's decision in *Gonzalez*, *supra*, 60 Cal.4th 533, supports a different conclusion. They contend a defendant can be convicted of multiple counts of rape under different subdivisions of section 261 for a single act of intercourse and the counts need not be consolidated.[16] According to the People, we need not apply our high court's consolidation procedure in *Craig*, because *Craig*'s holding and reasoning apply only to the version of the rape statutes in effect at the time of that decision.

In this regard, the People argue that a textual difference in the version of section 261 defendant violated here is significant. The version of section 261 under which defendant was convicted (and current version) reads, in pertinent part: "Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under

---

[16] The People do not contend here that a defendant can receive multiple punishments for the single act of intercourse, only that multiple convictions under separate counts are authorized.

29

*any* of the following circumstances . . . ." (Italics added.) The version of section 261 of which the defendant in *Craig* was convicted defined rape as " ' an act of sexual intercourse, accomplished with a female not the wife of the perpetrator, under *either* of the following circumstances . . . .' " (*Craig*, *supra*, 17 Cal.2d at p. 455, italics added.) The People contend that the change from "either" to "any" makes clear that a defendant can be convicted of multiple offenses under section 261 based on a single act. We disagree.

We have reviewed the legislative history concerning the amendments to section 261 pertinent here. The change from "either" to "any" occurred in 1979. (Stats. 1979, ch. 994, § 1.) That legislation, among other things, added Penal Code section 262, entitled "spousal rape" to change California law so that it would no longer be the case that, "as long as a man and woman [were] legally married, the man could not be prosecuted for rape." (Cal. Governor's Office, Enrolled Bill Rep. on Assem. Bill No. 546 (1979-1980 Reg. Sess.) Sept. 20, 1979.) With regard to section 261, the amendments served to render the language of that section more gender-neutral, and also replaced the word "either" with the word "any" as illustrated above (Stats. 1979, ch. 994, § 1). However, we have found nothing in the legislative history that provides an explanation why the Legislature made the change from "either" to "any," and the People point us to no such explanation.

We do not agree with the People that, by replacing the word "either" with the word "any," the Legislature intended to effect a wholesale change in the manner in which section 261 functions and to legislatively overrule *Craig*. The People overreach in concluding, without any support for the proposition, that the "change of 'any' is significant because it confirms that there are and can be different rape offenses under section 261." They would apparently have us ignore that the applicable case law from our highest court expressly held the opposite as to single acts of intercourse and that there

is no legislative history indicating a legislative intent to abrogate that Supreme Court precedent.

The People also focus on a dictionary definition of "any" as including "[o]ne or some, regardless of kind, quantity, or number" and "[a]n indeterminate number or amount." (American Heritage Dict. (2d college ed. 1982) p. 117.) Based on this definition, the People contend that "any" somehow converted section 261 to a statute listing multiple offenses. But "any" is consistent with the Legislature's definition of rape as sexual intercourse under "any" of the listed circumstances, and thus represents no substantive change from the former version of section 261 in *Craig*. Furthermore, in amending section 261, the Legislature did not change the structure of the rape statute or otherwise indicate that a person can be convicted of multiple rapes for a single act of intercourse if committed under more than one of the listed circumstances.

As for the Legislature's earlier use of the word "either" in section 261 prior to the 1979 amendment, the People note that "either" usually connotes an "either or" situation, such as "any one of two." (American Heritage Dict. (4th college ed. 2007) p. 448.) We agree that "either" is most typically used to refer to "one and the other of the two" or "one or the other of two," but we also note it is occasionally used to reference "of three or more." (American Heritage Dict. (2d college ed. 1982) p. 441.) In any event, our high court's opinions in *Craig* and *Gonzalez* mentioned nothing about the word "either." If the court had focused on the word "either" in *Craig*, following the People's reasoning, it is hard to see how consolidation would have been the procedure the court mandated. Since the common use of "either" connotes a choice of two or "either or," under the People's reasoning that this word is determinative as to the number of *convictions* that can be had from a single act of intercourse, it would seem that the *Craig* court would have held that the appropriate procedure would be to strike "one or the other" count rather than consolidating the two.

31

We think replacement of the word "either" in 1979 with the word "any" was not intended to reflect anything about the number of convictions that could be had from a single act of intercourse. Indeed, the change does not appear to be substantive at all, but rather, in conformance with common usage, expressive of the Legislature's intent that sexual intercourse under "any" of the listed circumstances would constitute the crime of rape.

The People suggest that the structure of the rape statute under which defendant was convicted is different from that in *Craig* and more akin to the section 288a offenses in *Gonzalez*, which provided for different punishments for each section 288a offense. This is so, according to the People, because section 264, the separate section setting forth the punishment of rape in effect when defendant committed the charged offenses, contains multiple punishments and the *Gonzalez* court noted that the provision of different punishments supported the conclusion that different subdivisions in section 288a signaled the Legislature's intent that section 288a states multiple offenses. The People's argument is based on the premise that the punishment for rape under the statute the *Craig* court construed was the same for all of the circumstances under which rape could be committed. However, under the former section 264 applicable to Craig's sentencing, there was more than one punishment for rape under section 261; there was a separate potential punishment for statutory rape. Section 264 provided for punishment of " 'not more than fifty years' in the state prison for rape committed in violation of *any* of the subdivisions of section 261." However, "[i]n the case of statutory rape (subd. 1, sec. 261), [section 264] also provide[d] for an alternative county jail punishment." (*Craig*, *supra*, 17 Cal.2d at p. 458.)

Furthermore, our high court in *Gonzalez* did not focus solely on the provision of different punishments for the subdivisions under section 288a; the *Gonzalez* court noted that each of the offenses in section 288a was "self-contained" in that each subdivision contained all of the elements and its own punishment language. It was this *self-*

*containment* that supported the view that each section 288a subdivision describes a separate offense. (*Gonzalez*, *supra*, 60 Cal.4th at p. 539.) To this day, the rape statute in section 261 is not self-contained in that way. Punishment is set forth in section 264, and instead of including one punishment for all circumstances under which rape could be committed except for one such circumstance (statutory rape) as in *Craig*, it now contains one punishment under all circumstances except two -- rape of a minor under 14 and rape of a minor over 14 by means for force, violence, duress, menace or fear.[17]

Moreover, as the majority in *White* noted, the various subdivisions in section 261 "describe lack of consent" and do not mention the word "rape" or "intercourse." (*White*, *supra*, 237 Cal.App.4th at p. 1099.) Subdivision (a), defines rape as an "act of sexual intercourse" and then references the circumstances in which there is no consent that makes the sexual intercourse the crime of rape. The words "an act of sexual intercourse" do not appear in the individual subdivisions and without subdivision (a) referencing that act, the enumerated circumstances do not state a crime. This is in contrast to the section 288a subdivisions that "define the various ways the act may be criminal." (*Gonzalez*, *supra*, 60 Cal.4th at p. 538.) Each of the section 288a subdivisions stating a crime include reference to "an act of oral copulation" in addition to the other elements and thus create self-contained subdivisions stating *all* elements of each of the separate crimes in addition to the punishment for those crimes.

---

[17] Section 264, subdivision (a), provides: "Except as provided in subdivision (c), rape, as defined in Section 261 or 262, is punishable by imprisonment in the state prison for three, six, or eight years." Section 264, subdivision (c), provides: "(1) Any person who commits rape in violation of paragraph (2) of subdivision (a) of Section 261 upon a child who is under 14 years of age shall be punished by imprisonment in the state prison for 9, 11, or 13 years. [¶] (2) Any person who commits rape in violation of paragraph (2) of subdivision (a) of Section 261 upon a minor who is 14 years of age or older shall be punished by imprisonment in the state prison for 7, 9, or 11 years."

We also note that the Legislature has enacted rape statutes since *Craig* in "self-contained" sections separate from section 261, a circumstance the People completely ignore. These enactments show that when the Legislature wants to create separate rape offenses, it has done so. What was once referred to as statutory rape in *Craig* (*Craig, supra*, 17 Cal.3d at p. 454) -- a circumstance under which the crime of rape then defined in section 261 could be committed -- is now a separate offense. The offense is now unlawful sexual intercourse and can be found in section 261.5, a "self-contained" statute setting forth several related offenses and penalties for each offense. Section 261.5 is structurally similar to section 288a.[18] Both sections contain subdivisions in which separate crimes, each with their own elements and punishment, are set forth. As we have mentioned, section 262 now defines the crime of spousal rape, a separate offense from the crime of rape. While a separate crime, section 262 is structurally similar to section 261 in that it sets forth a number of circumstances describing lack of consent under which the separate crime of spousal rape can be committed[19] and the punishment is specified in

---

[18] Section 261.5 currently provides in pertinent part: "(a) Unlawful sexual intercourse is an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor. For the purposes of this section, a 'minor' is a person under the age of 18 years and an 'adult' is a person who is at least 18 years of age. [¶] (b) Any person who engages in an act of unlawful sexual intercourse with a minor who is not more than three years older or three years younger than the perpetrator, is guilty of a misdemeanor. [¶] (c) Any person who engages in an act of unlawful sexual intercourse with a minor who is more than three years younger than the perpetrator is guilty of either a misdemeanor or a felony, and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170. [¶] (d) Any person 21 years of age or older who engages in an act of unlawful sexual intercourse with a minor who is under 16 years of age is guilty of either a misdemeanor or a felony, and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170 for two, three, or four years."

[19] Section 262 currently provides in pertinent part: "(a) Rape of a person who is the spouse of the perpetrator is an act of sexual intercourse accomplished under any of the following circumstances: [¶] (1) Where it is accomplished against a person's will by

section 264, subdivision (a). The punishment is the same as the separate offense of rape in section 261, yet since it is separate from section 261, section 262 clearly states a separate crime.

The People contend that because the elements of each subdivision in section 261 are different and neither is a lesser included offense of the other, then each subdivision must be treated as a separate offense for which there can be separate convictions. This interpretation follows from the People's reading of the discussion in *Gonzalez* about each subdivision in section 288a having different elements. According to the People, *Gonzalez* "signaled that the defining characteristic of whether offenses are different is the

means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another. [¶] (2) Where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known, by the accused. [¶] (3) Where a person is at the time unconscious of the nature of the act, and this is known to the accused. As used in this paragraph, 'unconscious of the nature of the act' means incapable of resisting because the victim meets one of the following conditions: [¶] (A) Was unconscious or asleep. [¶] (B) Was not aware, knowing, perceiving, or cognizant that the act occurred. [¶] (C) Was not aware, knowing, perceiving, or cognizant of the essential characteristics of the act due to the perpetrator's fraud in fact. [¶] (4) Where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat. As used in this paragraph, 'threatening to retaliate' means a threat to kidnap or falsely imprison, or to inflict extreme pain, serious bodily injury, or death. [¶] (5) Where the act is accomplished against the victim's will by threatening to use the authority of a public official to incarcerate, arrest, or deport the victim or another, and the victim has a reasonable belief that the perpetrator is a public official. As used in this paragraph, 'public official' means a person employed by a governmental agency who has the authority, as part of that position, to incarcerate, arrest, or deport another. The perpetrator does not actually have to be a public official. [¶] (b) As used in this section, 'duress' means a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and his or her relationship to the defendant, are factors to consider in apprising the existence of duress. [¶] (c) As used in this section, 'menace' means any threat, declaration, or act that shows an intention to inflict an injury upon another."

35

existence of different elements." The People urge that we can "respect *stare decisis*" and decline to follow the holding and reasoning in *Craig* by applying their view of *Gonzalez*, focusing on the elements of the section 261 subdivisions and the notion that the elements in the two counts for which defendant was convicted are different and neither is a lesser included offense of the other.

The People's argument fails for at least three reasons. First, the different subdivisions in section 261 have always contained different elements. The People recognize this, but they contend the *Gonzalez* court's "repeated emphasis of the elements test evidences that it is a defining characteristic." But this argument brings us to the second reason why the People's argument fails. The *Gonzalez* court did not say that *Craig* was based on the elements of the different subdivisions or whether those different subdivisions were included in each other. The court said section 261 states one crime of rape, a conclusion that "flowed naturally from the wording and structure" of that statute. (*Gonzalez*, *supra*, 60 Cal.4th at p. 539.) Third, the People's elements theory -- looking to whether the section 261 subdivisions are lesser included offenses with each other -- rests on the false premise that the subdivisions are *separate offenses*. But as we have noted, the various subdivisions of section 261 do not state an offense in and of themselves. Subdivision (a) states the gravamen of the offense -- sexual intercourse. The subdivisions set forth the circumstances in which there is a lack of consent that makes the sexual intercourse rape. Thus, the fact that each of the circumstances describing lack of consent contains different elements is of no moment.

Well over one hundred years ago, the California Supreme Court construed the rape statute as creating a single crime. (*People v. Vann* (1900) 129 Cal. 118, 121 [section 261 was not intended to " 'create six different kinds of crime' "].) Our high court has never overruled *Vann*. To the contrary, it has consistently confirmed the rule that section 261 is but one offense. (*Gonzalez*, *supra*, 60 Cal.4th at p. 539; *People v. Maury* (2003) 30 Cal.4th 342, 427 ["rape by means of violence is *not* a different offense from rape by

means of force or fear; these terms merely describe different circumstances under which an act of intercourse may constitute the crime of rape"]; *People v. Collins* (1960) 54 Cal.2d 57, 59 ["The subdivisions of section 261 do not state different offenses but merely define the different circumstances under which an act of intercourse constitutes the crime of rape"]; *Craig*, *supra*, 17 Cal.2d at p. 455.)

Our high court in *Gonzalez* noted that the People devoted most of their briefing in that case to arguing that *Craig* was wrongly decided and should be overruled. (*Gonzalez*, *supra*, 60 Cal.4th at p. 538.) But the *Gonzalez* court declined to do so and instead held that *Craig* is distinguishable. (*Ibid.*) We adhere to the reasoning in *Gonzalez* concerning *Craig*, to the holding in *Craig*, and to our high court's long-held view about section 261. (*Auto Equity*, *supra*, 57 Cal.2d at p. 455.) Only one offense of rape defined in section 261 results from a single act of intercourse, although the rape may be accomplished under more than one of the circumstances set forth in the section 261 subdivisions. " 'These subdivisions merely define the circumstances under which an act of intercourse may be deemed an act of rape; they are not to be construed as creating several offenses of rape based upon that single act.' "[20] (*Gonzalez*, at pp. 538-539, citing *Craig*, *supra*, 17 Cal.2d at p. 455.)

---

[20] The People also devote much of their argument in their supplemental briefing to the application of section 954, which provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or *different statements of the same offense* or two or more different offenses of the same class of crimes or offenses, under separate counts . . . ." (Italics added.) In their supplemental briefing, the People argue that section 954 permits multiple convictions for different statements of the same offense. This argument is not tied to or supported by *Gonzalez* and could have been made in the original briefing. Thus, this contention is forfeited as it was not raised in the original briefing. (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1092 [" 'It is well settled that arguments . . . cannot be raised for the first time in a petition for rehearing.' "]; *Singh v. Lipworth* (2005) 132 Cal.App.4th 40, 43, fn. 2 [issues not raised for the first time in a brief on rehearing, unaccompanied by an explanation for the delay, are forfeited]; *C&C Construction, Inc. v. Sacramento*

## II.  DNA Evidence

Defendant argues that the DNA evidence "was so flawed, unreliable, and unfairly prejudicial" that its admission violated due process.  Attempting to analogize the DNA evidence to impermissibly suggestive identification procedures, defendant contends the evidence should have been excluded and, without it, the evidence is insufficient to support the judgment.  We reject his claims.

### A.  Forfeiture

Defendant has forfeited his evidentiary challenge to the DNA evidence because in the trial court he did not seek to exclude the DNA evidence on the grounds he asserts here.  (Evid. Code, § 353; *McDaniel v. Brown* (2010) 558 U.S. 120, 134-136 [175 L.Ed.2d 582, 591-593] (*McDaniel*) [claim that DNA evidence constituted impermissibly suggestive identification evidence could not be raised for the first time in certiorari to the United States Supreme Court]; *People v. Medina* (1995) 11 Cal.4th 694, 753 [defendant's failure to object in trial court forfeited claim that identification procedure was unduly suggestive and unreliable]; *People v. Cua* (2011) 191 Cal.App.4th 582, 591 (*Cua*) [failure to object at trial to the scientific foundation for DNA evidence forfeited the claim for appeal].)

---

*Municipal Utility Dist.* (2004) 122 Cal.App.4th 284, 303 [argument that could have been raised in trial court and in original briefing but was not is forfeited].)  Moreover, the section 954 argument is beyond the scope of the supplemental briefing we requested. (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1345, fn. 6 [argument that went beyond scope of order directing supplemental briefing and which was not raised in opening brief waived on appeal].)  Based on the People's request for rehearing, which was grounded on *Gonzalez*, we requested supplemental briefing on the question how *Gonzalez* might relate to the question of whether the two rape counts should be consolidated.  The court in *Gonzalez* specifically declined to address the question of whether section 954 allows conviction on different statements of the same offense. (*Gonzalez, supra*, 60 Cal.4th at pp. 537, 540.)  Consequently, section 954 has no bearing on the question we asked and we decline to address the section 954 argument now, particularly since the People could have advanced this theory in their original briefing, but instead contended that the two counts here had to be consolidated.

In *Cua*, the court of appeal observed that there is no categorical prohibition on source attribution -- the expression of an opinion by a qualified expert that based on the quantitative and qualitative correspondence between an evidentiary sample and a known sample from the defendant that the defendant is the source of the DNA in the evidentiary sample. The court held that an expert is not necessarily precluded from expressing such an opinion, and the defendant failed to meet his burden to show that the trial court erred in not excluding the evidence sua sponte. (*Cua*, *supra*, 191 Cal.App.4th at pp. 600-601.) The court further stated that if the defendant had any factual or legal basis for objecting to the expert testimony, it was his obligation to state the specific grounds for the objection. (*Id*. at p. 601.) Had he done so, the prosecution could have elicited further evidence, and the trial court would have had the opportunity to make a fully informed ruling. (*Ibid*.) The same holds true here. Defendant had an obligation to object in the trial court on the grounds he belatedly asserts on appeal if he wished to preserve his claim.

Defendant notes reviewing courts have discretion to address substantial constitutional issues despite the appellant's failure to raise them in the trial court. However, such discretion is generally exercised for good reason. (*Hale v. Morgan* (1978) 22 Cal.3d 388, 394 [considered on appeal a matter that presented a question of law on undisputed facts]; *People v. Blanco* (1992) 10 Cal.App.4th 1167, 1172-1173 [matter of significance likely to be raised in habeas corpus petition].) Defendant offers no reason to excuse his forfeiture, which indeed appears to have been a tactical attempt to exploit a weakness in the DNA evidence and avoid motivating the prosecution to attempt to buttress its case by retesting, and defendant gives no reason why we should exercise discretion in this case involving a factual dispute. Instead, he falls back on a claim of ineffective assistance of counsel, which we reject, *post*.

### B. Admissibility of the DNA Evidence

Even if we were to consider the appellate challenge to the DNA evidence, it lacks merit. Defendant relies on cases discussing the exclusion of unreliable eyewitness

39

identification testimony tainted by improperly suggestive procedures that created a substantial likelihood of misidentification by the eyewitness. (*Perry v. New Hampshire* (2012) 565 U.S. __ [181 L.Ed.2d 694, 701]; *Neil v. Biggers* (1972) 409 U.S. 188, 198 [34 L.Ed.2d 401]; *Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247], criticized on other grounds in *McGautha v. California* (1971) 402 U.S. 183, 212 [28 L.Ed.2d 711]; *Stovall v. Denno* (1967) 388 U.S. 293, 301-302 [18 L.Ed.2d 1199]; *Abdur Raheem v. Kelly* (2d Cir. 2001) 257 F.3d 122, 133.) However, such cases are inapposite. They require exclusion of eyewitness identification in order "to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." (*Perry*, at p. 703.) In determining the reliability of an in-court eyewitness identification after an impermissibly suggestive out-of-court identification procedure, courts consider the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her description of the suspect, the level of certainty, and the lapse of time between the offense and the identification. (*Manson v. Brathwaite* (1977) 432 U.S. 98, 114 [53 L.Ed.2d 140].) None of these factors bears on the question whether a defendant's DNA matches DNA from a vaginal swab taken from a victim or the admissibility of DNA evidence or expert opinion testimony regarding that evidence. And defendant has cited no other grounds supporting his argument that the DNA evidence here should not have been admitted.

Nickel described the testing process, explained his observations, explained why he thought the third allele at D-5 was carryover, and provided the jury with alternatives. He agreed it was possible that the third allele came from an unknown male contributor or

Beto.  And he agreed he had no "scientific basis" for his carryover conclusion, but relied upon his background, training, and experience in opining that the most likely explanation for the third allele at D-5 was carryover.  The defense offered no contrary expert testimony in trial or as part of a pretrial motion to exclude the evidence.[21]  Instead, defense counsel cross-examined the witness to probe any weakness in the testimony and then used the weaknesses in the DNA evidence to defendant's advantage, by arguing to the jury that the third allele created reasonable doubt of defendant's guilt.  As defense counsel undoubtedly understood, any shortcomings related to the DNA evidence and the expert interpretation of that evidence went to the weight of the evidence and expert opinion, not to its admissibility.  (See *People v. Stevey* (2012) 209 Cal.App.4th 1400, 1414, 1417-1419 [the fact that Y-STR DNA testing cannot positively identify an individual does not mean the test is unreliable or that the results are not probative -- like a shoeprint that could match the shoes of people other than the defendant, the probative value of Y-STR testing is a question of weight, not admissibility; challenges to the interpretation of whether peaks represent alleles based on the level of RFUs goes to the weight of the evidence, not its admissibility]; *People v. Henderson* (2003) 107 Cal.App.4th 769, 788 [complications of analyzing multiple source DNA in an evidence sample does not affect the admissibility of the DNA evidence, but instead is a consideration for the jury in weighing the evidence and determining the credibility and accuracy of the DNA test results; jurors can distinguish and assign weight based on the description of the results obtained from DNA testing]; *People v. Smith* (2003) 107 Cal.App.4th 646, 672 [challenges regarding errors in DNA analysis of mixed samples should be directed to the weight of the evidence and not its admissibility].)

---

[21]  We note that defendant was represented by "DNA counsel," who filed motions, conducted the cross-examination of witnesses, and gave closing argument related to the DNA evidence.

We conclude the evidence was admissible and there was no due process violation.

## C. Ineffective Assistance of Counsel

We also reject defendant's claim of ineffective assistance of counsel. To prevail on such a claim, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never . . . easy.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 632] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 357 [176 L.Ed.2d 284, 297].)

The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] . . . Unlike a later reviewing court, the attorney observed the relevant proceedings, *knew of materials outside the record, and interacted with the client*, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' [Citations.]" (*Richter*, *supra*, 562 U.S. at p. 105 [178 L.Ed.2d at pp. 642-643], italics added.) If the record sheds no light on why counsel failed to raise a point in the trial court, we reject the claim of ineffective assistance of counsel unless trial counsel failed to provide an explanation at the trial court's request, or unless there could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Here, defendant fails to meet his burden. He simply argues there can be no rational reason for trial counsel not to preserve this substantial statutory and constitutional issue. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of

reasonable professional assistance." (*Richter*, *supra*, 562 U.S. at p. 105 [178 L.Ed.2d at p. 632].) Moreover, here there are obvious reasons for not objecting. The objection defendant asserts on appeal would have been without merit as we have explained. Furthermore, trial counsel's obvious strategy was to exploit the perceived weakness of the DNA evidence. In limine exclusion of the evidence would have forced the prosecution to retest. Presumably trial counsel spoke with his client and obtained confidential information that is not part of the record. Additionally, DNA counsel likely understood the odds of someone other than defendant sharing 14 alleles out of 15 alleles with defendant and differing by a tri-allele at the 15th allele. Given that information and the prospect that a clean retest without carryover would show that all 15 alleles matched defendant's alleles, it made more sense to argue absence of a match based on the original test. The same could be said for defense counsel's decision not to obtain and present an independent test. An attorney need not pursue a course of action that would be fruitless, much less one that might be harmful to the defense. (*Id.* at p. 644.) Defendant fails to show deficient performance by counsel.

Furthermore, defendant also fails to show prejudice. To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, 562 U.S. at p. 104 [178 L.Ed.2d at p. 642].) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d 171, at pp. 217-218.) Defendant has not shown by his own independent test or any other evidence that the result of a retest would have been favorable to him. Nor has he submitted expert opinion evidence contradicting Nickel's opinion that the most likely explanation for the third allele at D-5 is carryover. Consequently, defendant has not carried his burden of showing a reasonable probability he would have obtained a more favorable result.

43

Defendant has not shown that counsel's failure to object to the DNA evidence based on the grounds he asserts on appeal amounted to constitutionally ineffective assistance of counsel.

## D. Sufficiency of the Evidence

To the extent that defendant argues the evidence was insufficient to support the judgment, we disagree. The DNA evidence was properly admitted and, once admitted, it becomes a question of what weight the trier of fact gives to it. On review, the proper test is whether a rational trier of fact could find on the entire record that the defendant was guilty beyond a reasonable doubt. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) We view the evidence in the light most favorable to the prosecution (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560]; *People v. Holt* (1997) 15 Cal.4th 619, 667), even if some of the evidence was called into question. (*McDaniel*, *supra*, 558 U.S. at p. 131.) Substantial evidence includes circumstantial evidence and any reasonable inferences that can be drawn therefrom. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069-1070.) Here, the combination of the DNA evidence and other circumstantial evidence was sufficient to support the judgment. The DNA testing of the sperm fragment from the vaginal swab matched defendant at 14 loci. It is uncontroverted that the major profile is not Beto and it is not defendant's son. That leaves the only other male in the house, defendant. Unless there was some unknown male at the house who had intercourse with the victim who had the exact same profile at every location except one, where a potential triallele is located, then it must have been defendant who was the perpetrator. Nickel was not aware of any cases documenting a 14-loci match in samples from different people. Nor did defendant introduce any evidence indicating as much.[22]

---

[22] See *People v. Robinson* (2010) 47 Cal.4th 1104, 1115 [defendant's DNA was analyzed at 13 loci and the prosecution expert testified that there had been no reported cases of two people who are not identical twins matching at all 13 loci].

44

There was also non-DNA evidence. Defendant's slippers were found next to the bed, as were the victim's clothes, and when the victim went to bed, she was fully clothed. Defendant had no explanation for why his slippers were by the bed when confronted with this assertion during the pretext call. His shirt was also found on the floor. When confronted by Sophia about the shirt, the victim remembered that defendant said he brought it to her because she was cold, and Beto said defendant claimed the victim had asked him for a shirt. She had not. The jury was not required to accept the explanation defendant gave for this evidence at trial. Moreover, even at trial, defendant never expressly denied the rape. Instead, he just claimed he did not remember it, even though during the pretext call, which came out of the blue months after the night in question, he remembered other details of that night, e.g., that his son's girlfriend purportedly asked him for a shirt, that he provided her with a shirt, and that the shirt was black; that he took hits off a bottle and also had beer; that he smoked from a bong with his son's girlfriend; that his son's girlfriend tried to get the victim to smoke; that the victim declined the marijuana; that he passed out in the living room while playing the video game; that Beto woke him; that he went to bed in his bedroom; and that he woke up fully clothed.

There is sufficient evidence to support defendant's conviction.

### III. Jury Instruction on Adoptive Admission

Defendant argues the trial court erred in instructing the jury on adoptive admissions over defense objection. We disagree.

### A. Background

In discussing jury instructions, defense counsel objected to the court instructing the jury with CALCRIM No. 357 on adoptive admissions, arguing there was no basis or need for it. The prosecutor said he offered the instruction primarily to protect defendant because he had made statements that the jury could construe as admissions. The trial court cited (1) the pretext phone call and (2) Sophia confronting defendant, apparently about his shirt being in her room. When the discussion turned to the "consciousness of

45

guilt: false statements" instruction (CALCRIM No. 362[23]) -- which was given to the jury but not at issue on appeal -- the prosecutor noted the overlap between the two instructions, in that the jury may believe defendant lied to the victim in the pretext call when he said he did not remember having sex with her. The prosecutor added there was evidence that defendant falsely said the victim asked him for the shirt.

Regarding adoptive admissions, the trial court instructed the jury:

"If you conclude that someone made a statement outside of court that accused the defendant of the crime and the defendant did not deny it, you must decide whether each of the following is true:

"1. The statement was made to the defendant or made in his presence;

"2. The defendant heard and understood the statement;

"3. The defendant would, under all the circumstances, naturally have denied the statement if he thought it was true;

"AND

"4. The defendant could have denied it but did not.

"If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true.

"If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

---

[23] The court instructed the jury: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending it to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

## B. Analysis

Defendant argues there were no adoptive admissions, and therefore it was error to instruct on adoptive admissions. We find no error and, even assuming error, find no prejudice.

Evidence Code section 1221 provides, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

This statute "contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence or equivocal or evasive conduct." (*People v. Combs* (2004) 34 Cal.4th 821, 843 (*Combs*).) Admissibility of an adoptive admission is appropriate when a person is accused of having committed a crime under circumstances that fairly afford him an opportunity to hear, understand, and reply, and which do not lend themselves to an inference that he was relying on his constitutional right to remain silent, and he fails to speak or he makes an evasive or equivocal reply. (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.) A direct accusation of crime is not essential. (*Ibid.*) The evidence must show the defendant participated in a conversation in which a crime was discussed and the circumstances offered him the opportunity to deny responsibility or otherwise dissociate himself from the crime but that he did not do so. (*People v. Davis* (2005) 36 Cal.4th 510, 539.)

Here, in the pretext call, the victim opened the conversation by accusing defendant of "rape," a crime. Defendant discussed it with her, but never denied responsibility. Defendant argues his statements were not adoptive admissions because he repeatedly qualified his apologies with "if it happened." However, although he claimed he did not remember having sex with her -- the truth of which was for the jury to decide -- he did not denounce the possibility as outlandish. The jury could find that his purported lack of recollection of a sexual encounter was "equivocal or evasive conduct" (*Combs*, *supra*, 34

47

Cal.4th at p. 843), particularly because he purported to remember so many other specifics about that night, including what would have been an otherwise relatively inconsequential request by Karolyn to borrow one of his shirts.

The pretext call alone justified the instruction on adoptive admissions.

As to defendant's response to Sophia's question why his shirt was in her room -- because Karolyn asked for or needed a shirt -- the People on appeal impliedly concede this was not an adoptive admission. Sophia's question was not an accusation of a crime calling for a denial of responsibility or an attempt to otherwise dissociate himself. This response to Sophia's question was consistent with his statement during the pretext call, his trial testimony, and Karolyn's testimony.

Even assuming for the sake of argument that there was instructional error, it would not warrant reversal of the judgment. Defendant urges the prejudice standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705], but argues there is prejudice even under *People v. Watson* (1956) 46 Cal.2d 818. The People argue there was no prejudice under either standard. We agree with the People.

Defendant does not explain how he was prejudiced by the adoptive admission instruction. He merely makes a conclusory argument that this was a circumstantial evidence case. He focuses on evidence favorable to his position, e.g., the victim herself did not remember defendant doing anything to her; the victim often engaged in binge-drinking causing blackouts or memory lapses; the victim continued to visit defendant's home after that night; there was a weakness in the DNA evidence; and witnesses testified to defendant's good character. Defendant adds that the jury at his first trial was unable to reach a verdict. He argues the jury in this second trial considered this a troubling case because the jury deliberated for about five hours before arriving at a verdict. None of these points hint at prejudice from the adoptive admission instruction.

Defendant argues that, because no evidence qualified as an adoptive admission, the instruction could have misled the jurors to think there was such evidence when in fact

48

there was none. However, the pretext call at a minimum qualified as an implicit adoptive admission subject to the jury's findings. Permitting the jury to determine whether defendant's words admitted anything, as juries are regularly called upon to do, does not compromise defendant's constitutional right to silence. (*People v. Castille* (2005) 129 Cal.App.4th 863, 881.) The jury was not told that defendant's statement to Sophia about the shirt was an adoptive admission, and no one argued that point to the jury. The court gave the jury the standard instruction that some instructions may not apply. It was for the jury to decide whether defendant made an adoptive admission. The jury was not mandated by the instruction to find an admission. Moreover, the adoptive admission instruction told the jury not to use any of the statements for "any purpose" unless all of the requirements were satisfied. The instruction thus protected defendant. Indeed, by telling the jury it could not use the statements "for any purpose" if the predicates for an adoptive admission were not met, the jury was, in effect, told it could not use the statements as evidence of defendant's consciousness of guilt either.

The prosecutor in closing argument to the jury did not argue that defendant admitted the rape. Instead, the prosecutor argued to the jury that the pretext call showed motive in that defendant admitted he was attracted to the victim and knew he had no chance with her. In rebuttal argument, the prosecutor noted defense counsel said his client was genuine on that phone call, but "Even [defendant] said, I wasn't genuine. I was just trying to defuse the situation. So all that stuff I said, I didn't really mean it. [¶] And if it sounds bad, that's what his own client said." The prosecutor also noted in rebuttal argument that defense counsel said defendant denied the rape, and "Of course, he denied it. There's really only a couple of defenses in a sex case: I wasn't there. It's an alibi. I am not there. You consented. And that's generally about it. Or the other one, that's kind of ridiculous is, I don't remember. [¶] That's all he's ever said. How hard is it to say that? I don't remember, I don't know. [¶] That's ridiculous, when you start thinking about it in a sexual manner."

49

We conclude there was no instructional error and, even assuming error, it was not prejudicial.

## IV.  Cumulative Error

In a single sentence, defendant argues the cumulative effect of trial errors rendered his trial unfair.  We disagree.

## V.  Failure to Strike Prior Conviction

Defendant argues the trial court abused its discretion in denying his motion to strike the prior conviction used as a strike.  (§ 1385, subd. (a); *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 530 (*Romero*).)  We disagree with this assertion as well.

## A.  Background

The prior serious felony conviction was a 1991 conviction for assault with a deadly weapon.  According to defendant's memorandum of points and authorities supporting his motion to strike the strike allegation, this crime occurred when he found his then-wife cheating on him with another man, became enraged, and hit or threw something at the man's head.  The probation report states defendant "burst into" the house where the assault was committed.  The prosecution's sentencing brief states that according to the police report, defendant forced his way into the residence of the boyfriend of an ex-girlfriend, chased the boyfriend upstairs and struck him in the head with a candleholder.  A witness saw a hunting knife fall out of defendant's pocket as he ran up the stairs.  The witness observed defendant repeatedly strike the victim with his fist and a candleholder and had to pull defendant off the victim to stop the attack.  The victim sustained a bleeding gash on the side of his head and a large hematoma to his forehead.  The knife was recovered from the scene.  According to the prosecutor, defendant was charged with violations of sections 459 and 245, subdivision (a)(1).  Defendant pleaded no contest and was placed on formal probation for five years and ordered to serve 180 days of work furlough as a condition of probation.  After he successfully completed probation, the conviction was expunged.  (§ 1203.4.)

50

In 1989, defendant sustained a conviction for misdemeanor spousal battery (§ 273.5), and received a sentence of 10 days in jail and three years of informal probation. According to defendant's motion, this crime occurred when defendant came home to find his then-wife using methamphetamine with a male and female. Defendant said he struck his wife as she tried to stop him from fighting with the male. The probation report states that defendant struck his live-in girlfriend in the face several times with his fists and then struck her in a face with a baton. The prosecution stated in its sentencing brief that the police report stated defendant struck his girlfriend in the face with his fists, threw her down on the floor, ripped her shirt off, and then struck a different woman in the face with the baton.

In 1992, defendant sustained a conviction for misdemeanor assault, and received a sentence of 30 days in county jail plus one year of informal probation. According to defendant's motion, this crime occurred after he heard his estranged wife was going to travel to Mexico to engage in drug trafficking. He called police to conduct a welfare check on his wife and to get their children out of the home. As the police were leaving after the welfare check, defendant assaulted his estranged wife's lover and caused "minor injuries" by bumping the lover's head on the ground and biting him. However, the probation report states that defendant was observed sitting on the victim with his arm around the victim's neck. Defendant "hit the victim's head against the road surface while biting [him] on the left side of his neck." An officer noted "the victim had a considerably deep injury and was bleeding." The victim also had several cuts and abrasions over his body.

In 1993, defendant sustained a conviction for misdemeanor driving under the influence (Veh. Code, § 23152, subd. (a)) and received two days in county jail and three years of informal probation. His blood alcohol level was 0.16.

In 2000, defendant sustained a conviction for misdemeanor battery (§ 242) and received 30 days in jail and three years of informal probation. According to defendant's

51

motion, this crime occurred when defendant became frustrated by the lack of police response to his son being physically bullied and vandalism to his house. Defendant broke up an attack on his son and head-butted the boy who was beating defendant's son. According to the prosecution's sentencing brief, defendant found the boy in a Taco Bell restaurant, grabbed him by the shoulders, pushed him up against a door, and head-butted the boy. The boy's mother stated that defendant had threatened to kill her family, threatened to have his gang-banging friends " 'get' " her family, and made sexual threats towards her.

Defendant had no criminal convictions between 2000 and the November 28, 2009, offenses charged in this case. He was gainfully employed since age 16 until he became disabled at age 45.

Defense counsel argued most of the prior convictions occurred during a time when he had ongoing domestic problems. The ex-wife was subsequently arrested, avoided a life sentence by becoming a police informant in another state, and defendant won full custody of his children.

A Static-99R risk assessment was performed on defendant by an expert he retained. The test indicated defendant has less than a five percent chance of sexual offense recidivism.

The trial court in denying the motion said there were valid arguments on both sides, but found it was not in the interest of justice to strike the strike allegation because: the prior strike was a violent offense; although there may have been "reasons and explanations," the other prior convictions indicated defendant, "at least at that point," had a propensity for violence; and there is "implicit violence in the commission of any type of rape."

## B. Analysis

A trial court has the authority to dismiss a strike conviction in the interests of justice under section 1385, subdivision (a). (*Romero*, *supra*, 13 Cal.4th at p. 504) We

review the trial court's decision for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.] Taken together, these precepts establish that *a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.*" (*Id.* at pp. 376-377, italics added.)

In deciding whether to exercise its discretion to dismiss strike allegations, courts must determine whether the defendant should be deemed outside the spirit of the three strikes law and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies. (*People v. Williams* (1998) 17 Cal.4th 148, 161.) In making this determination courts must consider three factors: (1) the nature and circumstances of his present felonies; (2) the nature and circumstances of the strike offense; and (3) the particulars of the defendant's background, character, and prospects for the future. (*Id.* at p. 161.)

### 1. The Nature and Circumstances of the Current Offenses

The instant case, while not involving overt violence, did involve defendant sexually taking advantage of a house guest whose ability to resist or consent was clearly affected by her intoxication, a condition defendant facilitated by allowing the victim, who was under the legal age for drinking alcohol, to use his home for that purpose.

53

### 2. The Nature and Circumstances of the Strike Offense

The 1991 incident could actually have resulted in two strikes -- residential burglary for defendant's forcing his way into the home of his ex-girlfriend's new boyfriend, and the assault with a deadly weapon. It also appears, based on the prosecutor's uncontroverted assertion in his sentencing brief, that defendant was armed with a knife when he entered, but dropped the knife in his pursuit of the victim. It further appears that defendant would not have stopped his assault with the candleholder if he had not been pulled off the victim. The victim sustained a gash and large hematoma to his forehead.

### 3. Defendant's Background, Character, and Prospects for the Future

Defendant had four prior convictions involving violence. While he argues his own version of events to mitigate the propensity for violence, the trial court was not required to accept defendant's mitigated version of the prior convictions as an excuse for his resort to violence, just as the jury was not required to accept defendant's mitigated version of what happened in the instant case. Moreover, regardless of defendant's reasons, the trial court quite accurately found that defendant's prior conduct evinced a propensity for violence. Regarding the 1999 battery, police investigation revealed that the victim's mother said defendant had made *sexual threats* to her and threatened to kill her family before defendant committed the battery.[24] Finally, defendant's prospects were not

---

[24] As we have noted, the assertion that defendant made sexual threats to the victim's mother appears in the prosecution's sentencing brief. There was no supporting exhibit, but defendant did not dispute the assertion in his motion to dismiss the prior strike conviction, during argument on the motion or here on appeal. At the hearing on the motion, counsel argued, "And then the 242, as I outlined, his son was getting beat up by this older boy. He called the police, they would come out, the boy was gone, boy would come, throw rocks in the window, keep beating up his son. [Defendant], on his own, called the cops three times that day. [¶] Did he handle it right in the end? Absolutely not. But, again, I'm not saying what he did was right. I'm saying those were mitigating

encouraging due to his long history of alcohol and marijuana abuse -- including a history of alcohol-induced blackouts beginning at age 35 where " 'weekends would just disappear' " -- and there was no indication defendant was willing to or had attempted to address this problem.

### 4. Abuse of Discretion

Defendant fails to show abuse of discretion. He argues *Romero* requires individualized consideration of a defendant's particular circumstances, because every two strikes defendant has at least one prior serious and/or violent felony conviction. However, the trial court read and considered everything presented and gave consideration to striking defendant's strike allegation. And in any event, given the circumstances of the strike prior, the circumstances of the current offense and defendant's background, character and prospects for the future, defendant has failed to show that the trial court's "decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at p. 377.)

We conclude the trial court did not abuse its discretion in denying the *Romero* motion.

### VI. People's Request for Additional Fees and Assessment

The People ask us to modify the judgment to include imposition of mandatory fees and assessments which the trial court mistakenly failed to impose. They did not raise this matter in the trial court, but mandatory fees that do not raise factual questions may be imposed on appeal despite the prosecution's failure to bring them to the trial court's attention. (*People v. Talibdeen* (2002) 27 Cal.4th 1151, 1154; *People v. Smith* (2001) 24 Cal.4th 849, 853; *People v. Turner* (2002) 96 Cal.App.4th 1409, 1413.) Defendant does

---

circumstances that led to a 242 disposition that should be considered now by this Court as well."

not object in his reply brief; he merely says it appears that mandatory fines were not imposed.

Government Code section 70373, subdivision (a)(1), provides in part: "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense . . . . The assessment shall be imposed in the amount of thirty dollars ($30) for each . . . felony . . . ."[25]

At the time of defendant's conviction, section 1465.8, subdivision (a)(1), provided: "To ensure and maintain adequate funding for court security, a fee of thirty dollars ($30) shall be imposed on every conviction for a criminal offense . . . ."

Both of these provisions are mandatory. (*People v. Robinson* (2012) 209 Cal.App.4th 401, 405-406.)

Accordingly, we order imposition of the $30 fee and $30 assessment.

---

[25] The Attorney General's appellate brief offers an immaterial argument about retroactivity of the statute, which became effective January 1, 2009 -- before this offense was committed in November 2009.

## DISPOSITION

The judgment is modified to:  (1) consolidate count 2 into count 1 and reflect that defendant was convicted of section 261, subdivisions (a)(3) and (a)(4), in count 1; (2) to vacate the conviction on count 2, together with the sentence imposed but stayed on that count; and (3) to impose the mandatory $30 court facilities fee (Gov. Code, § 70373, subd. (a)(1)) and a $30 court operations assessment (§ 1465.8, subd. (a)(1)).  The judgment is otherwise affirmed.  The trial court is directed to prepare an amended abstract of judgment and minute order to reflect these modifications and forward a certified copy to the Department of Corrections and Rehabilitation.


     MURRAY     , J.


We concur:


     HULL     , Acting P. J.


     DUARTE     , J.